IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

THEODORE E. THORNTON, SR.      *
                               *
v.                             *
                               *    Civil Action No. WMN-07-1555
BALTIMORE CITY BOARD OF        *
SCHOOL COMMISSIONERS et al.    *
                               *
   *    *    *    *    *    *    *    *    *    *    *    *    *    *    *

**MEMORANDUM**

Before the Court is Defendants' Motion for Summary
Judgment.  Paper No. 48.  The motion is fully briefed.  Upon
review of the pleadings and the applicable case law, the Court
determines that no hearing is necessary, Local Rule 105.6, and
that the motion should be granted in part and denied in part.

## I. BACKGROUND

Plaintiff brings this action asserting that he was denied
the position as the Human Resources Officer for Defendant
Baltimore City Board of School Commissioners (the Board) on
account of his race (African American) and age (67, at the time
of application).  Plaintiff had previously held this same
position with the Board from 1999 until he resigned in 2001.
When Plaintiff was hired in 1999, the Board's Chief Executive
Officer (CEO) was Robert Booker.  In Booker's performance
evaluation of Plaintiff given in June of 2000, Booker reports
that Plaintiff's job performance was "outstanding" and his
accomplishments were "exemplary."  Thornton Aff., Ex. B.

Booker left the position of CEO in 2000 and was replaced by
Carmen Russo.  Although Plaintiff states that he was
experiencing resistance from Russo and other senior Board
employees over his insistence on following equal opportunity
principles, he acknowledges in his Complaint that when he
resigned in 2001, he did so voluntarily.  Compl. ¶ 12.  In his
deposition, he testified that his separation from the position
in 2001 was not discriminatory.  Pl.'s Dep. at 52.

At some point after Plaintiff's resignation, his former
position was filled as a contract position by William Boden.  A
decision made in or about 2005 not to renew Boden's contract led
to the hiring process that gave rise to this litigation.  In
February 2005, the Board posted a vacancy announcement for the
position in several local newspapers, trade publications, and on
its website.  By that time, Russo had been replaced by a new
CEO, Bonnie Copeland.  Believing that he would not encounter the
kinds of difficulties working with Copeland as he had with
Russo, Plaintiff timely submitted an application.

The Board employee responsible for coordinating the hiring
process was Lorrie Mundell, a senior recruitment specialist.
Mundell received applications from 36 individuals.  It was her
task to initially screen those applications to determine which
applicants met the minimum requirements for the position.  Of
the 36 initial applicants, 27 were found to meet the minimal

2

requirements, including Plaintiff.  Two additional candidates
were added to the pool and the resulting field of 29 candidates
was forwarded to a review panel consisting of Defendant George
Duque, Pamela Holland, and Fran Brown,[1] senior managers in the
Human Resources Department.  Mundell Decl. ¶ 7.  The review team
met and evaluated each candidate on a scale of "Best," "Better,"
or "Minimum."  Mundell consolidated those rankings and, under
the resulting matrix, two candidates were rated "Best," one was
rated "Better+," and three were rated "Better."  Id. ¶ 8.
Plaintiff was one of the three candidates earning a ranking of
"Better."  The remaining candidates were all deemed "Minimum."

Among the reasons given for not ranking Plaintiff as "Best"
was his lack of official certification as a human resources
professional.  This certification was listed as one of the
requirements for the position in the official posting.  The two
candidates receiving the "Best" designation had that
certification.  The four candidates receiving "Better+" or
"Better," including Plaintiff, did not.

---

[1] Holland testified that the review panel was made up of herself,
Duque, Valerie Wainwright, and Gary Grant.  Holland Dep. at 62.
Duque testified that he filled in for Fran Brown, who was on
medical leave at the time.  Duque Dep. at 41.  In a letter sent
to the EEOC investigating Plaintiff's charge, the Board appears
to represent that the screening was done by Grant, Holland,
Duque, and Brown.  See Morris Decl., Ex. B, attachment titled
"Human Resources Officer Selection Process Additional
Information."

Mundell passed the matrix on to Boden.  According to a letter sent by the Board's counsel to the Equal Employment Opportunity Commission (EEOC) during the course of the EEOC's investigation of Plaintiff's discrimination charge, the Human Resources Department's management team recommended that the Board's senior staff interview the top three candidates from Mundell's matrix, presumably the two "Best" and the one "Better+" candidates.  Morris Decl., Ex. A, Nov. 4, 2005 letter from J. Darrell Peterson.  Boden then identified two of the three "Better" candidates for interviews, omitting Plaintiff. Id.; see also Mundell Decl. ¶¶ 11, 13.

As to the remainder of the hiring process, there does not appear to be any contemporaneous documentation.[2]  Mundell states that in assembling the documentation concerning the selection process to aid the Board in responding to Plaintiff's EEOC charge she found no record, whatsoever, related to the candidate ultimately selected for the position, Gary Thrift.  Thrift's application was not part of the pool she assembled and reviewed, and there is no contemporaneous record of any screening to determine if he satisfied the minimum requirements for the

---

[2] In their reply memorandum, Defendants imply the Plaintiff was asserting in his opposition a claim of spoliation related to this lack of documentation.  Reply at 4-5.  The Court does not read the opposition as claiming the absence of documentation was evidence of spoliation, but simply was evidence of the pretextual nature of the decision.

position.  Mundell Decl. ¶ 17.  Mundell states further that, had Thrift's application been included with the original applications, she would have deemed him not qualified based upon the criteria included in the initial job posting.  Id. ¶ 18.

Defendants' explanation as to how Thrift, a white male approximately 15 years younger than Plaintiff, came to be hired is somewhat inconsistent and, again, is supported by no contemporaneous documentation.  In a letter written to the EEOC in November 2005, the Board justified its decision not to hire Plaintiff by stating, "Mr. Thornton was not selected for the Human Resources Officer position because he did not survive the first level of the evaluation and selection process employed by [the Board] to identify those candidates to be invited to interview for the position."  Morris Decl., Ex. A at 1.  The letter goes on to describe the initial screening, matrix ranking, and interview selection process discussed above, characterizing it as '[t]he basis process utilized by [the Board] to identify candidates for executive and management level positions, which . . . has been in use by [the Board] for at least five (5) years, with minor variations incorporated therein from time to time."  Id. at 2.

In asserting that Plaintiff's failure to be selected for the position had nothing to do with race or sex, the Board (through counsel) stated that "through a fair and impartial

process of ranking the various candidates for the position,"
Plaintiff did not receive a ranking high enough to warrant an
initial interview.  Id. at 3.  The Board notes that two of the
five candidates selected to be interviewed were African
American, and three of the four members of the HR Department
management team were as well.  Finally, the Board opines that,
because Plaintiff was never recommended to the CEO for the
position, "the CEO never had an opportunity to discriminate
against Mr. Thornton for any reason."  Id.

One year later, in November 2006 and in response to a
request from the EEOC for further information, the Board
explained how Thrift came to be selected for the position.
"Thrift was not considered for the position of Human Resources
Officer until after all of the candidates who had gone through
the selection process failed to favorably impress the then Chief
Executive Officer, Ms. Bonnie Copeland."  Morris Aff., Ex. B,
Nov. 14, 2006, letter from J. Darrell Peterson at 1.  Thrift
asked if he could apply for the position and did so.  In
reviewing his experience, the Board noted that Thrift was then
an Area Academic Officer (AAO) with the Board and had worked for
the Board in one capacity or another for 32 years.
"Consequently, Dr. Thrift he was very familiar with [the Board]
and had relevant experience in areas Ms. Copeland deemed
important, e.g., collective bargaining.  Dr. Thrift further

impressed Ms. Copeland with his knowledge of the HRMS system, with his ideas for making the Human Resources department more user friendly for the teachers and other staff, and with his strong management skills." Id. at p.2.

More recently, in an affidavit submitted in this litigation, Copeland gives her account of the reasons for hiring Thrift:

> Several Area Academic Officers mentioned to me that Dr. Gary Thrift, one of the Area Academic Officers, had handled many human resources issues and was thought of as a "first among equals." The Vice Chairman of the Board also told me that she had worked with him and believed that he had done an excellent job. The Board's Chief Academic Officer agreed. I knew that Dr. Thrift had many years of familiarity with the school system and was attentive to details, qualities that I considered important for the position. I also wanted someone who knew about the federal litigation challenging the timing of special education services, Vaughn G. [v. Amprey, Civ. No. MJG-84-1991 (D. Md.)],[3] and who could assist with the Board's ongoing obligations. Finally, I considered the value of promoting a current employee who was known to be competent and experienced against the risk of hiring an unknown applicant without a long institutional history.

Copeland Aff. ¶ 5. Copeland also stated that when rendering her decision, she was unaware that Plaintiff had applied for the position and that she did not see his resume or application. Id. ¶ 3.

---

[3] Vaughn G. is a decades-long class action suit filed in this Court alleging that Baltimore City Schools violated federal special education laws requiring the identification and education of students with disabilities.

Plaintiff posits a different explanation for the hiring decision.  He asserts that Defendant Jeff Grotsky, William Boden,[4] and Defendant George Duque, all white males, conspired to create a selection process that appeared to be open to competitive selection and yet, all the while, intended to have their friend, Thrift, placed in the position.  Apparently, Thrift's then-current position as an AAO was being eliminated as the school system downsized the number of schools and Thrift needed to find another position or he would be unemployed.  Plaintiff does not accuse Copeland of acting in a discriminatory manner, acknowledging that she had no awareness of his application.

After exhausting his remedies before the EEOC and receiving his right to sue letter, Plaintiff filed the instant Complaint.  In Count I of the Complaint, Plaintiff asserted that the Board violated Title VII of Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. (Title VII), and the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. (ADEA). In Count II, Plaintiff asserted a claim under 42 U.S.C. § 1983 against the Board, Grotsky, Boden, and Duque.  Count III asserted a claim of civil conspiracy to discriminate under 42 U.S.C. § 1985 against

---

[4] William Boden was initially also named as a defendant in this action.  After attempts to locate and serve Mr. Boden proved unsuccessful, Plaintiff voluntarily dismissed him from this action, without prejudice.

the three individual defendants.  Finally, Count IV alleged that
all defendants violated 42 U.S.C. § 1981's proscription against
race discrimination in the formation of contracts.

Defendants responded to the Complaint by filing a motion to
dismiss which the Court granted in part and denied in part.  The
Court dismissed Count III on the ground that the claim fell
within the doctrine of inter-corporate immunity.  The Court
permitted the remaining counts to go forward.  In reaching its
ruling, the Court rejected Defendants' argument that the Board
had Eleventh Amendment immunity from the claims asserted under
the ADEA, § 1981, and § 1983.

Discovery has now been completed and Defendants have moved
for summary judgment on the following grounds:

1) there is insufficient evidence to show that the Board's
reasons for not hiring Plaintiff were pretextual;

2) there is insufficient evidence as to the liability of
the individual defendants;

3) Plaintiff failed to come forward with evidence of any
official policy or custom of discrimination that would support a
claim against the Board under § 1983 or § 1981;

4) as to Count I, the ADEA does not authorize an award of
compensatory damages for pain and suffering;

5) as to Counts II and IV, §§ 1981 and 1983 do not authorize an award of punitive damages against a government entity; and

6) the Board is entitled to Eleventh Amendment immunity from the claims under the ADEA, § 1983 and § 1981.

In opposing Defendants' motion, Plaintiff addressed only the first of these arguments.

## II. STANDARD OF REVIEW

Summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil Procedure when there is no genuine issue as to any material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law.  In Anderson v. Liberty Lobby, Inc., the Supreme Court explained that, in considering a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  477 U.S. 242, 249 (1986).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.  Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented."  Id. at 252.

In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); see also E.E.O.C. v. Navy Federal Credit Union, 424 F.3d 397, 405 (4th Cir. 2005).  The opponent, however, must bring forth evidence upon which a reasonable fact finder could rely.  Celotex Corp. v. Catrett, 477 U.S. 317 (1986). "Once the movant has established the absence of any genuine issue of material fact, the opposing party has an obligation to present some type of evidence to the court demonstrating the existence of an issue of fact."  Pension Benefit Guar. Corp. v. Beverley, 404 F.3d 243, 246-47 (4th Cir. 2005) (citing Pine Ridge Coal Co. v. Local 8377, UMW, 187 F.3d 415, 422 (4th Cir. 1999)).  Rule 56(e) also requires that "affidavits submitted by the party defending against a summary-judgment motion contain specific facts, admissible in evidence, from an affiant competent to testify, 'showing that there is a genuine issue for trial.' " Id. (quoting 10B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2740, 399 (3d ed.1998)).  The mere existence of a "scintilla" of evidence in support of the nonmoving party's case is not sufficient to preclude an order granting summary judgment.  Anderson, 477 U .S. at 252.

This Court has previously held that a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." Shin v. Shalala, 166 F.Supp.2d 373, 375 (D. Md. 2001) (citations omitted). Indeed, this Court has an affirmative obligation to prevent factually unsupported claims and defenses from going to trial. Drewitt v. Pratt, 999 F.2d 774, 778-79 (4th Cir. 1993) (quoting Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987)).

## III. DISCUSSION

To support his claims of discrimination, Plaintiff relies exclusively on the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-804 (1973). Under that framework, the allocation of proof is as follows: (1) the plaintiff must first establish a prima facie case of discrimination; (2) if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant-employer to articulate a legitimate non-discriminatory reason for its actions; and (3) if the defendant carries this burden, the plaintiff must then establish by a preponderance of the evidence that the reason articulated by the employer is a pretext to mask unlawful discrimination. Texas Dept. of Community Affairs v.

Burdine, 450 U.S. 248, 252-53 (1981) (quoting McDonnell Douglas, 411 U.S. at 802-03).[5]

In Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000), the Supreme Court reiterated that evidence of pretext, combined with the plaintiff's prima facie case, does not compel judgment for the plaintiff, because "[i]t is not enough ... to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination." Id. at 147 (citation omitted).  The Court also stated, however, that under the appropriate circumstances "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." Id.  It is the plaintiff's burden to create an inference that the defendant's proffered reason is a pretext for intentional discrimination.  See id. at 147-48.  Pretext analysis does not convert Title VII into a vehicle for challenging unfair-but-nondiscriminatory-employment decisions.  Holder v. City of

---

[5] In their motion, Defendants cite the Supreme Court's recent decision in Gross v. FBL Financial Serv., Inc., 129 S. Ct. 2343 (2009), for the proposition that a plaintiff asserting an ADEA claim must prove that the employer took the challenged action "because of his age or her age, not merely that age was a motivating factor."  The Gross decision did clarify the burden of persuasion at trial for an ADEA plaintiff.  Decisions rendered by federal courts post-Gross, however, have continued to apply the McDonnell Douglass framework at the summary judgment stage.  See Ferruggia v. Sharp Electronics Corp., Civ. No. 05-5992 (D.N.J. Aug. 25, 2009) (collecting cases).

Raleigh, 867 F.2d 823, 828 (4th Cir. 1989).   Conclusory
allegations, without more, are insufficient to preclude the
granting of the defendant's summary judgment motion.   Ross, 759
F.2d at 365.

There is little dispute that Plaintiff can establish a
prima facie case of race and age discrimination.   In order to
establish a prima facie case of racial discrimination in a
refusal to hire case, the plaintiff must show that (1) he is a
member of a protected class; (2) he applied and was qualified
for a job which the employer was seeking applicants; (3) despite
his qualifications, he was rejected, and; (4) after his
rejection, the position remained open and the employer continued
to seek applicants from persons of his qualifications.   EEOC v.
Sears Roebuck and Co., 243 F.3d 846, 851 (4th Cir. 2001).   The
elements to establish such a prima facie case of age
discrimination under the ADEA are similar.   A plaintiff must
demonstrate that: (1) he was a member of a protected class,
i.e., that he was at least 40 years old; (2) his employer had an
open position for which he applied and was qualified; (3) he was
rejected despite his qualifications; and (4) the position
remained open or was filled by a similarly qualified applicant
who was substantially younger than the plaintiff, whether within
or outside the class protected by the ADEA.   See O'Connor v.
Consol. Coin Caterers Corp., 517 U.S. 308, 310-312 (1996).

14

Plaintiff was not only qualified for the position but actually once held this same position and received a glowing review of his performance in that position.  The Board employee responsible for making the initial determination of qualifications deemed him qualified and, in her view, equally qualified with two individuals who were given the opportunity to interview for the position.  Nevertheless, Plaintiff was not hired nor even interviewed and the position was awarded to a white applicant, 15 years younger than Plaintiff.

To meet their burden of production of a legitimate non-discriminatory reason for its action, Defendants posit the explanations set out above.  There are several difficulties with those explanations, however.  In the November 2005 letter, the Board describes its "fair and impartial" process of selecting candidates to be interviewed, a process that had been used by the Board for at least five years and that resulted in two African Americans being selected for interviews.  All this is of marginal relevance, however, as the individual hired for the position did not come through this process.

The November 2005 letter also states that Plaintiff did not receive a ranking high enough to warrant an initial interview. This representation is difficult to reconcile with the fact that Plaintiff received the same rating as two individuals who were selected for interviews.  Lorrie Mundell clarified that "nothing

in the information furnished [her] by the review team enabled [her] to distinguish any of the three candidates in the 'Better' rating from any of the other candidates in that same grouping." Mundell Decl. ¶ 9.   She opined further that nothing in the information she passed on to Boden "would have justified denying an interview to any other member of the grouping of candidates within that same rating."   Id. ¶ 10.[6]

The November 2006 letter and the explanation provided by Copeland in her affidavit raise another set of difficulties. The primary reasons given for Copeland's selection of Thrift were his familiarity with the school system, his experience in collective bargaining, and his knowledge of the pending federal litigation.   As one who held the same position that was being filled, Plaintiff certainly had significant familiarity with the school system and, more specifically, with the Human Resources Department.   Plaintiff testified, and Defendants do not dispute, that Plaintiff developed many of the then-existing systems and practices of that department.

---

[6] In the reply memorandum, Defendants argue that one of the reasons Plaintiff was not given an interview with the final decision maker was "he failed to possess the advertised-criterion of certification as a Professional in Human Resources or Senior Professional in Human Resources."   Reply at 3. Notably, however, neither of the other two "Better" candidates who were granted interviews had this certification, nor did the candidate ultimately hired for the position.

To the extent that experience in collective bargaining was a consideration in hiring Thrift, it was Plaintiff that had considerably more of that experience based upon the record before the Court.  Plaintiff declared that he was the principal architect of the collective bargaining strategy for the system and was the ultimate negotiator for the system during his tenure.  Pl.'s Decl. ¶ 17.  As an AAO, Thrift would not have had a comparable role in the collective bargaining process.  Id.[7]

As to the significance of Thrift's familiarity with the federal litigation, the Court notes that this litigation was also pending during Plaintiff's tenure with the school system. Furthermore, Plaintiff notes that, at no time during his tenure did his duties or responsibilities require any involvement with that litigation.  The Court's own familiarity with the nature and substance of the Vaughn G. litigation makes it question how knowledge of that litigation would have significantly aided the Board's Human Resources Officer.

For these reasons, the Court finds that Plaintiff has produced sufficient evidence for a jury to find that the reasons

---

[7] Plaintiff stated that he was "aware of no change in the process following his leaving the system to give Dr. Thrift more extensive knowledge or experience in collective bargaining." Id.  Defendants urge the Court to discount that statement as Plaintiff would have no awareness of changes because of his four year absence from the school system.  Reply at 3-4.  Defendants stop short, however, of providing any evidence of a change that would render Plaintiff's statement inaccurate.

given for not granting Plaintiff an interview (and thus assuring
he would not be hired) were pretextual.  In reaching this
conclusion, the Court is aware that Plaintiff may have undercut
his contention that the true reason for denying him the
opportunity was discriminatory by arguing that a motivation of
Boden, Duque, and Grotsky was to help a friend who was about to
lose his job.  That kind of favoritism, while otherwise
objectionable, is not actionable under federal
antidiscrimination law.  That Plaintiff made this argument,
however, is not fatal to his claim.  Courts have recognized that
employers can offer reasons for decisions that are pretextual
for both discrimination and favoritism.  See e.g., Artope v.
Center for Animal Care and Control, Inc., Civ. No. 05-9283, 2009
WL 874037 at *12 n.11 (S.D.N.Y. Mar. 27, 2009).  Furthermore,
Defendants vehemently deny that the decision was motivated by
favoritism.

     Turning to the liability of the individual defendants, the
Court has considerable difficulty discerning precisely what
Plaintiff is claiming each did to enact this scheme to place
Thrift in the position.  The only action detrimental to
Plaintiff's candidacy that can be attributed to an individual
was that of Boden, who is no longer a defendant.  According to
the record before that Court, it was Boden who determined which

18

candidates would be interviewed and it was he who decided not to pass Plaintiff's name on to Copeland.

Plaintiff has presented no evidence of discriminatory conduct on the part of Duque or Grotsky.  While Duque was part of the initial ranking process, there is no dispute that he gave Plaintiff as high a ranking as he gave any other candidate. Duque Dep. at 61.  Grotsky testified, and Plaintiff offered no evidence to dispute, that he played no role, whatsoever, in the hiring process.  Grotsky Dep. at 31-33.

Although Plaintiff makes no argument in his opposition for liability on the part of these individual defendants, he does speculate in his deposition that Duque only gave him a favorable ranking because he would not "run the risk of lying on an official document."  Pl. Dep. at 81.  Plaintiff also stated that "he assumed" that Copeland would have consulted Grotsky and Duque, along with Boden, because they were the three key advisors to the CEO and she "would not be stupid enough to make a selection decision" without their participation.  Id. at 86. This kind of unsupported speculation, however, is insufficient to survive a summary judgment motion and, accordingly, the Court will grant the motion as to Duque and Grotsky.

As to the Board's liability under § 1983, Defendants correctly note that local government entities cannot be held liable under § 1983 under a theory of respondeat superior.

Liability is extended under § 1983 only if the discriminatory actions of the individual actors were taken pursuant to an official policy or custom of the governmental entity.  <u>Monell v. Dept. of Social Serv.</u>, 436 U.S. 658, 690-91 (1978).  Courts place the same limitation on claims under § 1981.  <u>See</u> <u>Jett v. Dallas Indep. Sch. Dist.</u>, 491 U.S. 701, 710-11 (1989).  Plaintiff has offered no evidence of a custom or policy on the part of the Board to discriminate and he makes no argument in his opposition as to this aspect of Defendants' motion.  Accordingly, the Court finds that the Board is entitled to judgment as to Counts II and IV.

Plaintiff also does not contest that damages for pain and suffering are not recoverable under the ADEA.  <u>See</u> <u>Statin v. Stanford Research Inst.</u>, 590 F.2d 1292, 1296 (4th Cir. 1979).  Accordingly, the Court will grant Defendants' motion as to this damage claim.

Finally, the Board re-raises its entitlement to Eleventh Amendment immunity.  Because the Court is dismissing the Section 1981 and 1983 claims against the Board on other grounds, the only claim for which this argument is potentially relevant is Plaintiff's ADEA claim.  <u>See</u> <u>Kimel v. Florida Bd. Of Regents</u>, 528 U.S. 62, 91 (2000) (holding that ADEA does not contain valid abrogation of State's sovereign immunity to suits by private individuals).  In denying the Board's motion to reconsider its

ruling on this issue on the motion to dismiss, the Court opined that the Board could re-raise it in a motion for summary judgment.  The Court noted that this was a close issue that had been poorly briefed and that the resolution of the issue might be aided by a more fully developed record.  See March 4, 2008 Mem. & Order at 2-3.  Because the Board presents nothing new in this current motion, the Court rejects the argument for the reasons previously stated.

**IV. CONCLUSION**

Defendants' motion for summary judgment will be granted in part and denied in part.  The Court finds that Defendants are entitled to judgment on all but the Title VII and ADEA claims asserted against the Board in Count I.  A separate order will issue.


_____/s/_____
William M. Nickerson
Senior United States District Judge



DATED: November 9, 2009